UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BancInsure, Inc.,<br>an Oklahoma corporation<br><br>Plaintiff,<br><br>v.<br><br>Highland Bank,<br>a Minnesota banking corporation,<br><br>Defendant. | Case Number _____<br><br><br>**BANCINSURE, INC.'S COMPLAINT** |

Plaintiff, BancInsure, Inc. ("BancInsure"), by and through its undersigned attorneys, brings this Complaint against Defendant Highland Bank for Declaratory Judgment pursuant to 28 U.S.C. § 2201, regarding coverage under a policy of insurance issued by BancInsure to Highland Bank. In support of its cause of action, BancInsure states as follows:

### I.   PARTIES

1. BancInsure is a corporation incorporated under the laws of the State of Oklahoma, with its principal place of business in Oklahoma. BancInsure is duly qualified and authorized to transact its business within the State of Minnesota.

2. Upon information and belief, Highland Bank is a banking corporation chartered under the laws of the State of Minnesota, with its principal place of business in Minnesota.

### II.   JURISDICTION AND VENUE

3. This Court has the power to determine the parties' respective rights and other legal obligations as requested herein pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202. The disputes between BancInsure and Highland Bank, discussed below, create an actual controversy for this Court to adjudicate.

1

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(a) because all relevant actions and transactions occurred within this judicial district, and because the Defendant is located within this judicial district.

### III. FACTUAL ALLEGATIONS

**A. First Premier, on behalf of EAR, requests that Highland Bank finance an EAR equipment lease**

6. First Premier Capital, LLC ("First Premier") represents companies seeking financing for the acquisition of equipment. Equipment Acquisition Resources, Inc. ("EAR") hired First Premier to assist it in obtaining equipment financing. On behalf of EAR, First Premier approached various financial institutions to provide the sought-after financing.

7. In 2006, First Premier, on behalf of EAR, approached Highland Bank seeking a $3 million dollar loan to finance equipment acquisitions by EAR.

8. The First Premier/EAR transaction was to be set up as equipment lease financing, in which (a) Highland Bank would advance the acquisition cost of the equipment to First Premier, (b) First Premier would advance the funds to the vendor of the equipment, (c) First Premier would retain title to the equipment, (d) EAR would lease the equipment from First Premier, and (e) Highland Bank would receive repayment of its lease financing through an assignment of all First Premier's lessor's rights against EAR.

9. Highland Bank's lease financing was anticipated to have three sources of security. The primary source of security was to be an assignment by First Premier to Highland Bank of EAR's monthly lease payments to First Premier. The secondary source of security was to be an

assignment by First Premier to Highland Bank of First Premier's rights to repossess the equipment collateral. The tertiary source of security was to be an assignment by First Premier to Highland Bank of personal guarantees executed by EAR principals Sheldon Player and Donna Malone to First Premier.

**B.  Highland Bank's due diligence, and its approval of the equipment lease financing**

10. Highland Bank performed its own document review, credit review, and due diligence before deciding to approve the First Premier/EAR equipment lease financing.

11. In making its decision to extend this financing, Highland Bank did not rely on any document review, credit review or due diligence performed by others, including First Premier.

12. In conducting its due diligence for this financing, Highland Bank never contacted any EAR personnel, never performed an inspection of the equipment to be financed, and never performed a UCC search on the equipment to be financed.

13. Throughout the entire time Highland Bank conducted its document review, credit review, and due diligence, Highland Bank did not possess, review, inquire about or rely on any originals of the Player and Malone guarantees.

14. On October 5, 2006, the First Premier/EAR equipment lease financing proposal was approved by Highland Bank's Credit Committee.

15. Prior to the approval of the equipment lease financing by Highland Bank's Credit Committee, Highland Bank knew that Donna Malone had a credit score that did not meet the Bank's standards.

16. Highland Bank's Credit Committee's approval was not conditioned on Highland Bank's possessing, reviewing, inquiring about or relying on the originals of the Player and Malone guarantees.

17. Highland Bank and First Premier entered into an Assignment Agreement, identifying which rights First Premier agreed to assign to Highland Bank to secure Highland Bank's equipment lease financing ("Assignment Agreement"). The Assignment Agreement states that it assigns the monthly lease payments to Highland Bank, and states that it assigns to Highland Bank the right to repossession of the equipment collateral. The Assignment Agreement does not state that it assigns to Highland Bank any rights in the Player/Malone guarantees.

18. The only agreement between Highland Bank and First Premier with respect to the First Premier/EAR equipment lease financing was the Assignment Agreement.

19. There were no agreements between Highland Bank and EAR with respect to the First Premier/EAR equipment lease financing.

20. The Assignment Agreement did not identify or create any rights, obligations or duties between Highland Bank and First Premier with respect to the originals of the Player and Malone guarantees.

21. The Assignment Agreement did not designate or appoint First Premier as an authorized representative or agent of Highland Bank for purposes of possession or review of the original Malone and Player guarantees.

22. On October 19, 2006, Highland Bank wired $2,958,830.64 to First Premier.

23. At or before the time Highland Bank wired the $2,958,830.64, Highland Bank did not possess, review or inquire about the original Player or Malone guaranty.

C. **First Premier requests that Highland Bank finance additional EAR equipment leases.**

24. In January, 2007, First Premier presented another EAR equipment lease financing proposal to Highland Bank, a proposal that went through an approval process substantially the

4

same as that utilized by Highland Bank in the initial First Premier/EAR equipment lease financing transaction. Highland Bank agreed to fund this second First Premier/EAR equipment lease in the amount of $507,523.40, which was funded on April 17, 2007.

25. In April of 2007, First Premier presented a third EAR equipment lease financing proposal to Highland Bank, a proposal that went through an approval process substantially the same as that utilized by Highland Bank in the initial First Premier/EAR equipment lease financing transaction. Highland Bank agreed to fund this third Premier/EAR equipment lease in the amount of $527,660.59, which was funded on May 7, 2007.

26. With respect to these second and third First Premier/EAR equipment lease financings, Highland Bank performed all its own document review, credit review and due diligence.

27. With respect to these second and third First Premier/EAR equipment lease financings, Highland Bank did not rely on any document review, credit review or due diligence performed by others, including First Premier.

28. With respect to these second and third First Premier/EAR equipment lease financings, Highland Bank never possessed, reviewed or inquired about the original Player or Malone guaranty.

29. With respect to these second and third First Premier/EAR equipment lease financings, Highland Bank never stated, as a condition of approval or disbursement of these financings, that Highland Bank possess, review or inquire about the original guarantees.

30. With respect to these second and third First Premier/EAR equipment lease financings, the Assignment Agreements with First Premier did not designate First Premier as Highland Bank's authorized agent for purposes of possession or review of the Player or Malone

guarantees, nor did these Assignment Agreements identify or create any rights, obligations or duties between the parties with respect to the original guarantees.

31. The Assignment Agreements for these second and third First Premier/EAR equipment lease financings state that they assign the monthly lease payments to Highland Bank and assign the equipment collateral. These Assignment Agreements do not state that they assign to Highland Bank any rights in the Player/Malone guarantees.

32. The Assignment Agreements were the only agreements between Highland Bank and First Premier with respect to these second and third equipment lease financings.

### D. EAR defaults on the lease payments, EAR fraud is discovered, and Highland Bank submits a Proof of Loss to BancInsure.

33. Beginning in September, 2009, EAR missed its monthly lease payments.

34. In October, 2009, Highland Bank discovered that the equipment purportedly financed by the First Premier/EAR equipment lease financing was pledged to multiple lenders, likely had an inflated value, was not owned by First Premier, and in fact did not exist. In addition, guarantor Donna Malone filed for bankruptcy protection.

35. On January 11, 2011, Highland Bank submitted a Proof of Loss to BancInsure, claiming that Financial Institution Bond No. FIB 0010691 issued by BancInsure to Highland Bank (the "Bond") covered Highland Bank's losses related to the First Premier/EAR equipment lease financing.

36. A true and correct copy of the Bond is attached at Exhibit A.

37. In its Proof of Loss, Highland Bank states that Donna Malone's signature on the guaranty was forged.

38. Highland Bank's Proof of Loss identifies the following losses on the First Premier/EAR equipment lease financing as follows:

A. Note 724639501, which had an original principal balance of $2,958,830.64, had a principal balance due and owing as of December 1, 2010 of $1,571,656.52.

B. Note 724639502, which had an original principal balance of $507,523.40, had a principal balance due and owing as of December 1, 2010 of $122,905.38.

C. Note 724639503, which had an original principal balance of $527,660.59, had a principal amount due and owing as of December 1, 2010 of $317,056.49.

Highland Bank's total claim against the Bond is $2,011,618.30

### E. BancInsure's Financial Institution Bond

39. Highland Bank's Proof of Loss alleges coverage for its First Premier/EAR equipment lease financing losses under the Bond's Insuring Agreements (D) and (E).

40. Insuring Agreement (D) has a single loss limit of liability of $5,000,000.00 and a single loss deductable of $25,000.00. Insuring Agreement (D) covers the following:

(D) FORGERY OR ALTERATION

Loss resulting directly from:

(1) forgery or alteration of, on, or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, Withdrawal Order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit,

(2) transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any financial institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or financial institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems, sent by a person other than the said customer or financial institution purporting to send such instructions or advices shall be deemed to bear a signature which is a Forgery,

(3) the Insured's acceptance of a Demand Draft which purports to have been authorized by the customer of the Insured upon which the Demand Draft is drawn, but which has been issued without the knowledge and consent of

such customer. For the purposes of this Insuring Agreement (D)(3), the term "Demand Draft" means a writing not signed by the Insured's customer that is created by a third party under the purported authority of the Insured's customer for the purpose of charging the customer's checking account with the Insured. A Demand Draft shall contain the Insured's customer's checking account number and shall contain one or more of the following:

(a) the customer's printed or typewritten name;
(b) a notation that the customer authorized the draft.

(4) the receipt by the Insured, in good faith, of any Counterfeit Negotiable Instrument.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

41. Insuring Agreement (E) has a single loss limit of liability of $5,000,000.00 and a single loss deductible of $25,000.00, which in turn is subject to the Deductible Amount Rider. Insuring Agreement (E) covers the following:

(E) SECURITIES

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original

(a) Certificated Security,
(b) Document of Title,
(c) Deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
(d) Certificate of Origin or Title,
(e) Evidence of Debt,
(f) Corporate, partnership or personal Guarantee,
(g) Security Agreement
(h) Instruction to a Federal Reserve Bank of the United States, or
(i) Statement of Uncertificated Security, which

(i) bears a signature of any maker, drawer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or any person signing in any other capacity which is a Forgery,

        (ii)    is altered, or
        (iii)   is lost or stolen,

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (1)(a) through (h) above. This includes loss resulting directly from a registered transfer agent accepting or instructions concerning transfer of securities by means of a medallion seal, stamp, or other equipment apparatus which identifies the Insured as guarantor, as used in connection with a Signature Guarantee Program, but such use or knowledge or consent of the Insured, and the Insured is legally liable for such a loss,

(3) acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any item listed in (1)(a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (1)(a) through (i) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

42. Defined terms in Insuring Agreements (D) and (E) are found at "Conditions and Limitations," Section 1, as follows:

(a) Acceptance means a draft which the drawee has, by signature written on the draft, engaged to honor as presented.

....

(e) Certificate of Deposit means an acknowledgement in writing by a financial institution of receipt of Money with an engagement to repay it.

(f) Certificate of Origin or Title means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(g) Certificated Security means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer which is
    (1) represented by an instrument issued in bearer or registered form,
    (2) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment, and
    (3) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

....

(j) Counterfeit means an imitation which is intended to deceive and to be taken as an original.

(k) Document of Title means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

....

(n) Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

(o) Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

....

(q) Guarantee means a written undertaking obligating the signer to pay the debt of another to the Insured or its assignee or to a financial institution from which the Insured has purchased a participation in the debt, if the debt is not paid in accordance with its terms.

(r) Instruction means a written order to the issuer of an Uncertificated Security requesting that the transfer, pledge, or release from pledge of the Uncertificated Security specified be registered.

(s) Letter of Credit means an engagement in writing by a financial institution or other person made at the request of a customer that the financial institution or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(t) Loan means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.

....

(v) Negotiable Instrument means any writing
  (1) signed by the maker or drawer, and
  (2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, and
  (3) is payable on demand or at a definite time, and
  (4) is payable to order or bearer.

....

(x) Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

....

(ll)     Withdrawal Order means a non-negotiable instrument, other than an Instruction, signed by a customer of the Insured authorizing the Insured to debit the customer's account in the amount of funds stated therein.

43.     The Bond contains the following at "Conditions and Limitations," Section 2:

(a)     loss resulting directly or indirectly from forgery or alteration, except when covered under Insuring Agreement (A), (D), (E) or (F);

....

(e)     loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), (E), (P) or (Q);

....

(p)     loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement (A), (D), (E) or (F);

....

(s)     potential income, including but not limited to interest and dividends, not realized by the Insured (including for purposes of this exclusion portions of outstanding promissory notes payable to the Insured which represents payments of interest, fees and penalties in connection with prior promissory notes payable to the Insured);

....

(u)     all fees, costs and expenses incurred by the Insured in establishing the existence of or amount of loss covered under this bond except when covered under Insuring Agreement (T);

(v)     indirect or consequential loss of any nature.

## COUNT I: DECLARATORY JUDGMENT

BancInsure hereby incorporates by reference the allegations contained in Paragraphs 1-43 of this Complaint as if set forth fully herein.

44.     Highland Bank's claim does not implicate coverage under Insuring Agreement (D) of the Bond for reasons that include but are not limited to the following: Highland Bank claims Bond coverage based upon an allegedly forged personal guaranty, and a personal guaranty is not included in the list of covered documents under Insuring Agreement (D).

45. Highland Bank's claim does not implicate coverage under Insuring Agreement (E) of the Bond for reasons that include but are not limited to the following:

    A.    Highland Bank did not have actual physical possession of the original, allegedly forged guaranty at any time before or after Highland Bank's decision to approve the three First Premier/EAR equipment lease financings. Satisfaction of the "actual physical possession" requirement is a "condition precedent" to satisfaction of Insuring Agreement (E)'s requirement that Highland Bank must rely on the original, allegedly forged document in making its decision to approve the extension of credit.

    B.    First Premier was not Highland Bank's "authorized representative" for purposes of actual physical possession of the original, allegedly forged guaranty.

    C.    Highland Bank did not rely on the original, allegedly forged guaranty in making its decision to approve the three First Premier/EAR equipment lease financings.

    D.    Highland Bank has failed to prove Insuring Agreement (E)'s requirement that its loss is the direct result of the allegedly forged Malone personal guaranty. The collateral secured by the three First Premier/EAR equipment lease financings was valueless and in fact did not exist. The Bank knew, when entering into the equipment lease financings, that Donna Malone had an insufficient credit score to meet Highland Bank's standards and Donna Malone filed for bankruptcy. Highland Bank failed to conduct rudimentary due diligence. Highland Bank failed to perform UCC checks on the fictitious collateral. Although the lease financing was "non-recourse" with respect to First Premier and therefore depended for its viability upon EAR and its principals, Highland Bank failed to communicate with EAR or its principals. Highland Bank's loss resulted from Sheldon Player's Ponzi scheme, which involved fictitious collateral, multiple fraudulent pledging of collateral, and misuse of loan funds.

    E.    Highland Bank's Proof of Loss was accompanied by the following statement:

> As to good-faith, Highland Bank followed sound business practices and fully investigated, verified, and examined the required documents before remitting loan proceeds, and therefore maintains this extension of credit was an insured risk and an ordinary business loan.... As laid out in the Proof of Loss narrative, Highland Bank more than exceeded sound business practices, conducted an extensive investigation into the transaction's viability, and verified pertinent documentation before extending credit.

> The evidence submitted does not support Highland Bank's assertions of sound business practices, full investigation, verification, and examination of required

12

documents before remitting loan proceeds. This evidence includes but is not limited to Highland Bank's failure to conduct rudimentary due diligence, failure to conduct UCC checks on fictitious collateral, failure to make any contact in its due diligence with EAR or its principals, and failure to inspect or review the original guarantees.

46. BancInsure is entitled to a declaration from this Court that there is no coverage for Highland Bank's alleged losses from the First Premier/EAR equipment lease financings, or any other insuring agreement of the Bond.

WHEREFORE, BancInsure respectfully requests the following relief:

1. For an Order declaring that BancInsure has no obligation, under the Bond or otherwise, to Highland Bank with regard to Highland Bank's alleged losses resulting from the First Premier/EAR equipment lease financings;

2. For an Order awarding BancInsure its costs and disbursements herein; and

3. For such further relief as this Court deems just and proper.

GREGERSON, ROSOW, JOHNSON & NILAN, LTD

Dated: 8-31-11         By _____
                           Mark J. Johnson, #132810
                           Joseph A. Nilan, #121277
                           Davis A. Kessler, #0387856
                           650 Third Avenue South, #1600
                           Minneapolis, MN 55402-4337
                           (612) 338-0755

                           Attorneys for Defendant BancInsure, Inc.,
                           an Oklahoma corporation.