UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BancInsure, Inc.,
an Oklahoma corporation,

        Plaintiff,

v.

Highland Bank,
a Minnesota banking corporation,

        Defendant.

Civil No. 11-2497 (SRN/JSM)

**MEMORANDUM OPINION AND ORDER**

---

Mark J. Johnson, David A. Kessler, and Joseph A. Nilan, Gregerson Rosow Johnson & Nilan, Ltd., 650 Third Avenue South, Suite 1600, Minneapolis, MN 55402, for Plaintiff.

Eric M. Laine, Patrick H. O'Neill, Jr., and Stephen M. Warner, O'Neill & Murphy, 332 Minnesota Street, Suite W2600, St. Paul, MN 55101, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Highland Bank's Motion for Partial Summary Judgment [Doc. No. 27]. For the reasons stated below, the Court grants Defendant's Motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On May 16, 2005, Equipment Acquisitions Resources, Inc. ("EAR") and First Premier Capital, LLC ("First Premier") entered into a lease agreement ("the Lease Agreement"), under which First Premier was to provide certain semiconductor equipment to EAR and to assist EAR in obtaining financing for the lease of this equipment. (Lease Agreement, Ex. 1 to Aff. of Patrick O'Neill [Doc. No. 16-1].) Stephen Alpeter, Partner

at First Premier, and Sheldon Player, President of EAR, executed the Lease Agreement. As a condition precedent to the Lease Agreement, Player and Donna Malone – EAR's principals – executed personal guaranties with First Premier, unconditionally guaranteeing payment to First Premier of all obligations under the Lease Agreement. (Player & Malone Guaranties, Exs. 2 & 3 to O'Neill Aff. [Doc. No. 16-1].) Prior to entering into the Lease Agreement, Mr. Alpeter testified that First Premier reviewed personal financial statements of Player and Malone and corporate and personal tax returns as part of its due diligence. (Alpeter Dep. at 197, Ex. 4 to O'Neill Dep. [Doc. No. 17-1].) The Player and Malone Guaranties were executed on May 27, 2005 and the originals were kept in First Premier's possession. (Proof of Loss Form, Ex. 27 to O'Neill Aff. [Doc. No. 25-1].)

On EAR's behalf, First Premier approached Defendant Highland Bank in 2006, seeking to borrow $3 million to finance the lease of the equipment. (Compl. ¶ 7 [Doc. No. 1].) Plaintiff alleges that the parties contemplated an arrangement whereby Highland Bank would advance the $3 million acquisition cost of the equipment to First Premier, which would then advance the funds to the equipment vendor. (Id.) First Premier would retain title to the equipment and EAR would lease the equipment from First Premier pursuant to a lease schedule. (Id. ¶ 8.) Highland Bank would receive payment of its lease financing through an assignment of the rental payments due First Premier under the Lease Agreement. (Id.) First Premier sent various financial documents to Highland Bank prior to entering into any agreement (Proof of Loss, Ex. 27 to O'Neill Aff. [Doc. No. 25-1]), and also sent a certified copy of the original guaranty documents. (Certified Copy of

2

Malone Guaranty, Ex. 8 to O'Neill Aff. [Doc. No. 21-1].) The document sent to Highland Bank bears a stamp stating, "THIS IS A CERTIFIED COPY OF THE ORIGINAL," next to which Mr. Alpeter wrote the date and his initials. (Id.) Alpeter testified that the certified document constituted a representation to Highland Bank that the original document was in First Premier's possession. (Alpeter Dep. at 75, Ex. 4 to O'Neill Aff. [Doc. No. 17-1].) In October 2006, Highland Bank's Credit Committee approved the First Premier/EAR equipment lease financing proposal. Thus, in October 2006, Highland Bank and First Premier entered into an assignment agreement ("the Assignment Agreement") memorializing the general terms described above. (Assignment Agreement, Ex. 13 to O'Neill Aff. [Doc. No. 11-1].)

After Highland Bank made the initial $3 million loan, it made two additional loans in 2007, with a cumulative sum exceeding $4 million. (Compl. ¶¶ 24-32.) The subsequent loans involved the same three entities – Highland Bank, First Premier, and EAR – and were handled in the same manner as the first loan. (Id.)

As to the relationship between Highland Bank and First Premier regarding the EAR equipment lease financing, Highland Bank's Chief Credit Officer Joseph White testified that he viewed First Premier as Highland Bank's agent:

> I would point out to you that First Premier was considered our agent in relationship with the lessee. They were the primary contact. They obtained all the information and provided it to us. And that would include typically three years of financial statements on the business, tax returns on the business, individual financial statements, tax returns on the individual guarantor.

\*\*\*

> They collected the payments, they initiated the transaction, they had all of the contact with the lessee, they provided the bank with all of its information for semiannual or annual reviews of transactions that were being done with them. And again it was a typical sort of a transaction, very similar to what we were doing in loan participations with other banks. The lead bank was responsible for the contact with the borrower and making sure that the appropriate documentation and monitoring information was obtained acting on behalf of the participants, and that was a similar transaction with First Premier.

(White Dep. at 11-12; 19, Ex. 5 to O'Neill Aff. [Doc. No. 20-1].)

After approximately 30 months, in September 2009, EAR ceased making its lease payments. (Compl. ¶ 33.) Highland Bank investigated the default and learned, among other things, that the leased equipment did not actually exist, and that the equipment purportedly purchased was pledged to multiple lenders. (Id. ¶ 34.) In addition, Highland Bank discovered that the guaranty provided by Donna Malone was a forged instrument. (Id. ¶ 37.) In October 2009, EAR filed for Chapter 11 Bankruptcy. (Loan Charge Off Request, Ex. 21 to O'Neill Aff. [Doc. No. 24-1].) In December 2009, Highland Bank determined that its loans to First Premier were no longer bankable assets and it executed a "Loan Charge Off Request" on these loans totaling $2,011,618.30. (Id.)

In January 2010, Highland Bank filed suit against First Premier in Minnesota state court, alleging that First Premier was in default of the representations, warranties, and covenants under the Assignment Agreement and the subsequent agreements. (Ramsey County Compl., Ex. 22 to O'Neill Aff. [Doc. No. 24-1].) Stephen Alpeter testified that Highland Bank obtained judgment against First Premier, but, to his knowledge, the judgment was not enforced because First Premier was no longer in business. (Alpeter Dep. at 116, Ex. 4 to O'Neill Aff. [Doc. No. 17-1].)

Highland Bank had previously entered into a financial institution bond ("the insuring bond") with Plaintiff BancInsure, under which BancInsure agreed to indemnify Highland Bank for losses arising from a variety of exposures, such as forgery and counterfeiting. (Insuring Bond, Ex. A to Complaint [Doc. No. 1-1].) In January 2011, Highland Bank submitted a Proof of Loss to BancInsure, claiming that the insuring bond covered Highland Bank's losses related to the First Premier/EAR equipment lease financing. (Compl. ¶ 35.) Highland Bank submitted a total claim of $2,011,618.30 against the insuring bond arising from losses it incurred out of the three loans. (Id. ¶ 38; Proof of Loss Form, Ex. 27 to O'Neill Aff. [Doc. No. 25-1].) In its Proof of Loss submission, Highland Bank contended that the loss was covered under Insuring Agreement D "Forgery or Alteration," and Insuring Agreement E "Securities." (Proof of Loss Form at 1, Ex. 27 to O'Neill Aff. [Doc. No. 25-1].) In pertinent part, Insuring Agreement E provides coverage for:

> Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1) acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original
>
> \*\*\*
>
> (f) Corporate, partnership or personal Guarantee, [which]
>
> \*\*\*
>
> (i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery,
>
> \*\*\*
>
> (2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (1)(a) through

5

    (h) above.  This includes loss resulting directly from a registered transfer agent accepting or instructions concerning transfer of securities by means of a medallion seal, stamp, or other equipment apparatus which identifies the Insured as guarantor, as used in connection with a Signature Guarantee Program, but such use or alleged use of said medallion seal, stamp, or other equipment apparatus was committed without the knowledge or consent of the Insured, and the Insured is legally liable for such loss,

  (3)  acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any item listed in (1)(a) through (d) above which is a Counterfeit.

    <u>Actual physical possession of the items listed in (1)(a) through (i) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items</u>.

    A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

(Insuring Bond at 6, Ex. 1 to Compl. [Doc. No. 1-1]) (emphasis added).

  On August 31, 2011, BancInsure denied coverage, contending as to Insuring Agreement E, that because Highland Bank did not have actual physical possession of the document, it failed to satisfy the insuring bond's condition precedent.  (Denial of Coverage at 12, Ex. 28 to O'Neill Aff. [Doc. No. 25-1 at 33]) (citing <u>BancInsure v. Marshall Bank</u>, 400 F. Supp.2d 1140, 1143 (D. Minn. 2005.))   That same day, BancInsure filed the instant lawsuit, seeking a declaratory judgment that BancInsure has no obligation to Highland Bank stemming from the First Premier/EAR agreements.  (Compl. ¶ 46 [Doc. No. 1].)

## II. DISCUSSION

Highland Bank seeks partial summary judgment on the limited issue of whether First Premier was the "authorized representative" of Highland Bank regarding the "actual physical possession" requirement of Insuring Agreement E. In response, BancInsure maintains that First Premier was not Highland Bank's authorized representative or agent. BancInsure also raises additional arguments in response to the instant motion, e.g., the contention that the Malone Guaranty is not a guaranty covered by the insuring bond. To the extent that Plaintiff's responsive arguments go beyond the scope of the motion, the Court does not address them.

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment

may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**B.     Authorized Representative**

The insuring bond in this case does not define the term "authorized representative." Principles of agency may be used to determine whether an entity is another entity's authorized representative. National City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 176 (Minn.1989). In National City Bank, the Minnesota Supreme Court addressed the issue of whether another bank was an authorized representative of the plaintiff bank under a bond containing a physical possession condition precedent, similar to the insuring bond here. Id. In reaching its determination, the court considered whether an agency relationship existed between the two entities. Id. The necessary elements of an agency relationship are: (1) consent to the agency; (2) action by the agent on behalf of the principal; and (3) exercise of control by the principal over the agent. Matter of Ins. Agents' Licenses of Kane, 473 N.W.2d 869, 873 (Minn. Ct. App. 1991) (citing A. Gay Jenson Farms Co. v. Cargill, Inc., 309 N.W.2d 285, 290-91 (Minn. 1981). "An agency relationship may be established even though the parties did not call it an agency relationship and did not intend the legal consequences of such relationship." Id. (citing Cargill, 309 N.W.2d at 290.)[1]  For instance, an agency

---

[1] As Defendant notes, BancInsure's Assistant Claims Manager Van Butler testified in another case between these parties that there was no requirement in the insuring bond that an authorized representative be designated in writing. (Butler Dep. at
continue...

8

relationship may be created through a course of dealing. Cargill, 309 N.W.2d at 290. While the existence of an agency relationship is a legal determination, "it is necessarily dependent upon the factual arrangement between the parties." Kane, 473 N.W.2d at 873.

The Assignment Agreement between First Premier and Highland Bank, and their subsequent agreements, do not use the term "agent;" therefore, the Court looks to the record to determine whether an agency relationship existed. Regarding the element of consent, the focus is on whether the principal consented to the agency relationship, "since one cannot be the agent of another except by consent of the latter." Cargill, 309 N.W.2d at 290 (citing Larkin v. McCabe, 299 N.W. 649 (1941)). The evidence in the record shows that Highland Bank consented to First Premier acting as its agent for purposes of the transactions at issue, and specifically for purposes of First Premier maintaining possession of the original Malone guaranty. Joseph White of Highland Bank testified that "First Premier was considered our agent in relationship with the lessee." (White Dep. at 11, Ex. 5 to O'Neill Aff. [Doc. No. 20-1].) In his deposition, First Premier's Chief Credit Officer Alpeter agreed that Highland Bank allowed First Premier to retain the original Malone guaranty. (Alpeter Dep. at 79, Ex. 4 to O'Neill Aff.. [Doc. No. 17-1].) He also testified that, by virtue of Highland Bank's acceptance of the certified Malone guaranty, Highland Bank agreed that First Premier would retain the original. (Id. at 79-80.) Alpeter noted that while he could not recall a specific conversation about retention of the original, he testified that anything not in a particular agreement would have been a

---

[1]...continue
68, Ex. C to Aff. of Stephen M. Warner [Doc. No. 34-4].)

point of discussion between the parties. (Id. at 42.) Alpeter further testified that while the Assignment Agreement was "fairly broad," the details – including details stipulating to the guaranties – would have been agreed upon orally. (Id. at 26.)

In addition, Joseph White of Highland Bank testified that it was standard practice for First Premier specifically, as well as other lease financing companies generally, to retain the original signed guaranties. (White Dep. at 13, Ex. 5 to O'Neill Aff. [Doc. No. 20-1].) He further testified that certified copies of original documents were acceptable to Highland Bank. (Id. at 43.) Having visited First Premier's offices periodically, White had no reason to question that First Premier provided to Highland Bank certified copies of original documents in First Premier's possession. (Id. at 43-44.) As Highland Bank contends, it agreed to accept certified copies of the guaranties based upon warranty language in the Assignment Agreement that the originals were genuine: "[t]he Lease and any accompanying guaranties, waivers, or other documents executed by or between Assignor, as Lessor, and the Lessee are genuine and enforceable in accordance with the terms. . . ." (Assignment Agreement at 2, Ex. 22-1 to O'Neill Aff. [Doc. No. 22-1].) Thus, the Court concludes that the consent element of agency is established under these facts.

The record also shows that First Premier acted on Highland Bank's behalf – the second element of an agency relationship. While Plaintiff argues that First Premier did not act as Highland Bank's agent for purposes of physical possession of the original loan guaranties, First Premier concedes that "the record shows that the Bank and First Premier did have an agreement whereby First Premier acted as an agent for other purposes."

10

(Pl.'s Opp'n Mem. at 28 [Doc. No. 32].) As set forth above, however, the record establishes not only that Highland Bank consented to First Premier's retention of the original documents, but that First Premier also acted as the bank's agent for purposes of retaining the original documents. In addition, as recognized by both parties, First Premier functioned as Highland Bank's agent by performing the following tasks: collecting and remitting loan payments, paying sales and use tax, providing additional financial documentation, updating insurance, inspecting collateral and acting as the primary contact with EAR. (Id.; Assignment Agreement, Ex. 13 to O'Neill Aff. [Doc. No. 22-1].)

As to the "control" element of agency, BancInsure argues that Highland Bank cannot establish its control over First Premier because in Highland Bank's state court complaint against First Premier, it alleged that First Premier had control over Highland. (Pl.'s Opp'n Mem. at 30) (citing State Court Complaint ¶ 35 [Doc. No. 24-1].) That allegation, however, concerned Highland Bank's claim that First Premier had fiduciary duties to Highland Bank under the Assignment Agreement. Authorization for First Premier to retain physical possession of the original guaranties as Highland Bank's representative was not a term in the Assignment Agreement. Rather, Highland Bank possessed "control" over the location of the original documents, and over the transaction in general, because Highland Bank held the funds. Highland Bank determined whether or not to fund the First Premier/EAR transactions based on the elements in the entire package, including the Master Lease and the guaranties. The record shows that Highland Bank permitted First Premier to retain the originals with the understanding that Highland Bank would receive certified copies, which it did.

BancInsure cites language in Insuring Agreement E that provides coverage for losses resulting from Highland Bank's extension of credit on the faith of any original personal Guarantee, and argues that at the time Highland Bank approved the loan, or 'extended credit,' First Premier was not Highland Bank's agent for purposes of the actual physical possession requirement. (Pl.'s Opp'n Mem. at 23, n.10 [Doc. No. 32]; Assignment Agreement, Ex. A to Compl. [Doc. No. 1-1].) Highland Bank, however, contends that the point at which it actually funded the First Premier/EAR transaction is determinative of when it was 'extending credit,' and that First Premier was clearly its agent at that time. (Def.'s Reply Mem. at 13-14 [Doc. No. 33].) In <u>BancInsure v. Marshall Bank</u>, this Court interpreted an 'actual physical possession' provision in this type of bond as requiring "actual physical possession of the original document at the time of disbursal." 400 F. Supp.2d 1140, 1143 (D. Minn. 2005) (citing <u>National City Bank</u>, 447 N.W.2d at 177-78.) At the time of disbursal, or funding of the loan, Mr. White of Highland Bank had reviewed the documents provided prior to funding, which would have included copies of the guaranties. (White Dep. at 17, Ex. 5 to O'Neill Aff. [Doc. No. 201].) White further testified that having the guaranties in hand was a requirement before Highland Bank disbursed its funds. (<u>Id.</u> at 31.) Stephen Alpeter of First Premier also testified, "I assume that if we didn't provide the appropriate documentation, as had been agreed to, that they wouldn't fund." (Alpeter Dep. at 58 [Doc. No. 17-1].) As the Court has found in its analysis of the elements of agency, the necessary consent, agreement and control existed at time the funds were disbursed. The Court therefore finds that, under the terms of the insuring bond, the agency relationship between Highland Bank and First

12

Premier existed at the required point in time.

The Court thus concludes that an agency relationship has been established and that First Premier was Highland Bank's authorized representative regarding the actual physical possession requirement of Insuring Agreement E. Again, while the Court's analysis of this issue is confined to the record and the application of principles of agency to the record, the facts of this case are distinguishable from other rulings in which, under similar insuring agreements, no authorized representative existed. For example, in National City Bank, the court found that there was no relationship between National City Bank and the other entity, much less an agency relationship. 447 N.W.2d 171, 176. There, an individual lender, Clemens, delivered the first of two fake stock certificates to First National Bank of Minneapolis ("First Bank") as security for a loan that he was obtaining from First Bank. Id. He subsequently pledged and delivered a second fake certificate to First Bank. Id. at 173. Over a year later, Clemens negotiated a loan with the plaintiff, National City Bank, including the two fake stock certificates as assets in his financial statement. Before remitting the loan proceeds to Clemens, National City Bank verified that First Bank had possession of the documents, but did not obtain actual physical possession of them prior to remitting the loan proceeds because First Bank still possessed them as security for the loan it had issued to Clemens. Id. at 173-74. National City Bank issued its loan to Clemens, then made arrangements to pay Clemens' outstanding loan at First Bank and to receive the stock certificates. After National City Bank paid off the First Bank loan, First Bank delivered the two certificates to National City Bank. The following day, the FBI alerted National City Bank that Clemens' stock

certificates might not be genuine. Id. at 174.

National City Bank's insuring bond with the defendant, St. Paul Fire & Marine Insurance Company, provided coverage for all forms of losses sustained by the bank, including the bank's good faith extension of credit in reliance on a counterfeit security. Id. Clause E of the bond required National City Bank, or its authorized representative, to have actual physical possession of the security in question, as a condition precedent to its reliance upon the instrument. Id. After St. Paul Fire & Marine denied coverage, the bank sued under the bond. The Minnesota Supreme Court affirmed the trial court's determination that First Bank was not National City Bank's authorized representative, and denied National City Bank's recovery, stating

> [National City Bank's] dealings with First Bank were for the sole purpose of acquiring the [stock] certificates. It was a mere coincidence First Bank was the depository of the fake certificates when National City negotiated the Clemens loan, thus there was no act making First Bank an "authorized representative" of respondent."

Id. at 176. In contrast, here, the relationship between Highland Bank and First Premier was not one of "mere coincidence," but was an intentional relationship involving several assignment agreement transactions and the agreement that First Premier maintain the original documents.

A recent case before this Court involving the same parties, Highland Bank v. BancInsure, Inc., 10-CV-4107 (SRN/AJB), is also distinguishable. In Highland Bank, the undersigned entered judgment in BancInsure's favor, finding that the insuring bond provided no coverage under the particular facts of that case. Highland Bank, Order of 8/24/12 at 10 [Doc. No. 58]. Unlike the instant case, in Highland Bank, the question of

14

whether another party, KLC, was the bank's authorized representative was only raised as an alternative argument – an argument for which Highland Bank presented no evidence. Id. at 8, n.3. Lacking evidence that an authorized representative obtained the original documents in that case, the record instead showed that persons involved in the transaction at Highland Bank never saw the original documents, nor knew where the original lease documents were located. Id. at 6-7. Here, the entire focus of Highland Bank's Motion for Partial Summary Judgment is whether First Premier was Highland Bank's authorized representative. The record reflects that First Premier retained the original documents as Highland Bank's agent. Both First Premier and Highland Bank were fully aware that First Premier retained the original documents and that Highland Bank possessed certified copies. The Court therefore finds the facts and proof submitted in the two cases distinguishable.

Similarly, the facts of Marshall Bank are different from the facts presently before the Court. In Marshall Bank, this Court held that BancInsure was entitled to summary judgment because Marshall Bank possessed only facsimile copies of the original documents and therefore failed to satisfy the requirements of the insuring bond. 400 F. Supp.2d at 1144. However, Marshall Bank did not involve the issue of whether a third party functioned as an authorized representative, which, again, is the sole basis for coverage at issue in the instant motion.

In reaching this ruling granting Defendant's Motion for Partial Summary Judgment, the Court makes no determination as to the ultimate issue of whether Highland Bank's claim is covered under the insuring bond. Rather, this ruling is strictly limited to

the issue of whether First Premier was Highland Bank's authorized representative. Having concluded that First Premier was so authorized, Defendant's Motion for Partial Summary Judgment is granted on this issue.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Defendant Highland Bank's Motion for Partial Summary Judgment [Doc. No. 27] is **GRANTED**.


Dated:   December 4, 2012 	s/Susan Richard Nelson  
	SUSAN RICHARD NELSON  
	United States District Judge