**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| BancInsure, Inc., an Oklahoma corporation, | Case No. 11-cv-2497 (SRN/JSM) |
| Plaintiff and Counter-Defendant, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Highland Bank, a Minnesota banking corporation, | |
| Defendant and Counter-Claimant. | |

Joseph A. Nilan and Mark J. Johnson, Gregerson, Rosow, Johnson & Nilan, Ltd., 650 Third Avenue South, Suite 1600, Minneapolis, Minnesota 55402, for Plaintiff and Counter-Defendant.

Patrick H. O'Neill, Jr., Eric M. Laine, and Stephen M. Warner, O'Neill & Murphy, 332 Minnesota Street, Suite W2600, Saint Paul, Minnesota 55101, for Defendant and Counter-Claimant.

SUSAN RICHARD NELSON, United States District Judge

## I.     INTRODUCTION

This matter is before the Court on the parties' cross motions for summary judgment. For the reasons set forth below, Plaintiff and Counter-Defendant BancInsure, Inc.'s Motion for Summary Judgment [Doc. No. 65] is granted, and Defendant and Counter-Claimant Highland Bank's Motion for Summary Judgment [Doc. No. 49] is denied.

## II.     BACKGROUND

This case arises from a declaratory judgment action between a bank and its insurer.

The insurer, BancInsure, Inc. ("BancInsure"), seeks a declaration that Highland Bank's loss is not covered under the Financial Institution Bond that BancInsure issued to Highland Bank.  (Compl. ¶¶ 44-46 [Doc. No. 1].)  Highland Bank has counterclaimed for breach of contract, a declaratory judgment that it is entitled to coverage, and breach of good faith and fair dealing.  (Countercl. ¶¶ 33-45 [Doc. No. 3].)

### A.  EAR and First Premier's Lease Agreement

On May 16, 2005, Equipment Acquisitions Resources, Inc. ("EAR") and First Premier Capital, LLC ("First Premier") entered into a lease agreement ("the Lease Agreement"), under which First Premier was to provide manufacturing equipment to EAR. (Lease Agreement, Ex. 2 to Aff. of Joseph A. Nilan [Doc. No. 58-2].)  Stephen Alpeter, a Partner at First Premier, and Sheldon Player, President of EAR, executed the Lease Agreement.  (Id.)  As a condition precedent to the Lease Agreement, Player and Donna Malone—EAR's principals—executed personal guaranties with First Premier, unconditionally guaranteeing payment to First Premier of all obligations under the Lease Agreement.  (Player & Malone Guaranties, Exs. 2 & 3 to O'Neill Aff. [Doc. No. 16-1].) Before entering the Lease Agreement, Mr. Alpeter testified that First Premier reviewed personal financial statements of Player and Malone, in addition to corporate and personal tax returns as part of its due diligence.  (Alpeter Dep. at 197, Ex. 4C to O'Neill Aff. [Doc. No. 19-1].)  On May 27, 2005, the Player and Malone Guaranties were executed, and First Premier kept the original documents in its possession.  (Proof of Loss Narrative, Ex. 27 to O'Neill Aff. [Doc. No. 25-1].)

2

### B.  First Premier and Highland Bank's Agreement

In 2006, First Premier approached Defendant Highland Bank on EAR's behalf, seeking to borrow $3 million to finance the equipment lease.  (Compl. ¶ 7 [Doc. No. 1].) The parties contemplated an arrangement by which Highland Bank would advance the $3 million acquisition cost of the equipment to First Premier, which would then advance the funds to the equipment vendor.  (Id.)  First Premier would retain title to the equipment, and EAR would lease the equipment from First Premier under a lease schedule.  (Id. ¶ 8.) Highland Bank would receive payment of its lease financing through an assignment of the rental payments due to First Premier under the Lease Agreement.  (Id.)  As relevant here, First Premier assigned three schedules to Highland Bank: (1) schedule 005R in October 2006, in exchange for a payment of $2,958,830.64; (2) schedule 008 in April 2007, in return for $507,523.40; and (3) schedule 009R in May 2007, in return for $527,660.59.  (Exs. 12-14 to Nilan Aff. [Doc. No. 58-7].)

In transferring First Premier's interest in each of the lease schedules, Highland Bank and First Premier signed one agreement—the "Collateral Assignment of Lease Payments and Equipment"—and made no oral agreements.  (White Examination under Oath at 27-28, Ex. 37 to Nilan Aff. [Doc. No. 58-21].)  Under this agreement, First Premier assigned the following to Highland Bank: the "rental payments due or to become due under the Lease," and all of First Premier's "rights, title and interest in and to the personal property subject to the Lease."  (Exs. 12-14 to Nilan Aff. [Doc. No. 58-7].)  The agreement did not include an assignment of the guarantees pledged to First Premier by Sheldon Player and Donna Malone.  (Id.)

3

Before entering the transactions, First Premier sent various financial documents to Highland Bank.  (Proof of Loss Narrative at 2-3, Ex. 28 to Nilan Aff. [Doc. No. 58-14].)  A credit presentation by Highland Bank, dated October 5, 2006, shows that Sheldon Player and Donna Malone had a tangible net worth of negative $4,580,000 and contingent liabilities of $38,811,683.  (Ex. 15 at 5 to Nilan Aff. at 5 [Doc. No. 58-5].)  This document also shows that Malone had a credit score below 660 and was "outside of HB's target market."  (Id. at 1.)  Another credit presentation by Highland Bank, dated January 10, 2007, shows that Player and Malone had a tangible net worth of negative $13,134,614 and contingent liabilities of $53,500,000.  (Ex. 16 at 7 to Nilan Aff. [Doc. No. 58-9].)

First Premier also sent certified copies of the original guaranties to Highland Bank. (Proof of Loss Narrative, Ex. 28 at 5 to Nilan Aff. [Doc. No. 58-14].)  The copy of the Malone guaranty bore a stamp stating, "THIS IS A CERTIFIED COPY OF THE ORIGINAL," next to which Mr. Alpeter wrote his initials and the date, October 17, 2006. (Certified Copy of Malone Guaranty, Ex. 8 to O'Neill Aff. [Doc. No. 21-1].)  The certified document represented to Highland Bank that the original document was in First Premier's possession.  (Alpeter Dep. at 75, Ex. 38 to Nilan Aff. [Doc. No. 58-22].)  Highland Bank did not see or inquire about the original Malone guaranty.  (Id. at 199-200; White Examination under Oath at 45-46, Ex. 37 to Nilan Aff. [Doc. No. 58-21].)

In addition, Highland Bank received UCC Financing Statements, an invoice, and a certificate of acceptance that a security interest had been recorded in the collateral delivered under the First Premier/EAR lease agreement.  (Ex. 4 to O'Neill Aff. [Doc. No. 62-2].) Highland Bank also received an invoice, dated July 27, 2006, regarding an inspection of

machinery and equipment located at EAR.  (Ex. 5 to O'Neill Aff. [Doc. No. 62-3].)

Before closing any of the three loans, Highland Bank did not contact EAR, Player, or

Malone.  (White Examination under Oath at 27, Ex. 37 to Nilan Aff. [Doc. No. 58-21].)

Highland Bank did not inspect the equipment securing the transactions or determine its

liquidation value.  (Id. at 52-53.)  It also did not conduct a background check on Player or

Malone, or ask First Premier to do the same.  (Berglund Dep. at 26, Ex. 42 to Nilan Aff.

[Doc. No. 58-26].)  First Premier recalls that it informed Highland Bank about Sheldon

Player's prior conviction for lease fraud.  (Id. at 25-26; Alpeter Dep. at 144, Ex. 38 to Nilan

Aff. [Doc. No. 58-22].)  Nonetheless, Highland Bank proceeded with all three transactions.

From January 2007 until September 2009, EAR made all payments due under the

lease schedules, which amounted to more than $2.6 million in lease payments to Highland

Bank.  (Exs. 29-31 to Nilan Aff. [Doc. No. 58-15]; Lange Dep., Ex. 40 at 43-44 to Nilan

Aff. [Doc. No. 58-24].)  On June 25, 2008, Highland Bank sold a percentage of its interest

in schedule 005R to Ridgedale State Bank, transferring a 64.855% interest in future

payments on schedule 005R.  (Participation Certificate and Agreement, Ex. 32 to Nilan Aff.

[Doc. No. 58-16].)  In return, Ridgedale paid Highland $1.5 million.  (Id.)  According to

Highland Bank's Proof of Loss, Highland Bank later acquired Ridgedale State Bank.  (Proof

of Loss Narrative at 6 n.2, Ex. 28 to Nilan Aff. [Doc. No. 58-14].)

### C.  EAR's Fraud and Highland Bank's Actions

In September 2009, EAR stopped making its lease payments.  (Compl. ¶ 33 [Doc.

No. 1].)  Highland Bank investigated the default and learned, among other things, that the

leased equipment did not actually exist, and the equipment purportedly purchased was

pledged to multiple lenders.  (Id. ¶ 34.)  Highland Bank also discovered that the guaranty

provided by Donna Malone was likely forged.  (Id. ¶ 37.)  After EAR's default, Highland

Bank moved its loans to non-accrual status.  (Ex. 24 to Nilan Aff. [Doc. No. 58-12].)  On

October 23, 2009, EAR filed for Chapter 11 Bankruptcy.  (Proof of Loss Narrative, Ex. 28

at 10 to Nilan Aff. [Doc. No. 58-14].)  By December 2009, Highland Bank determined that

the loans were uncollectible and executed a "Loan Charge Off Request" for $2,011,618.30.

(Ex. 25 to Nilan Aff. [Doc. No. 58-12].)

        In January 2010, Highland Bank filed suit against First Premier in Minnesota state

court, alleging that First Premier was in default of the representations, warranties, and

covenants under the Assignment Agreement.  (Ramsey County Compl., Ex. 43 to Nilan Aff.

[Doc. No. 68-1].)  Highland Bank obtained judgment against First Premier, but has been

unable to collect on its judgment.  (Lange Dep. at 70, Ex. 40 to Nilan Aff. [Doc. No. 58-

24].)  By September 2010, Malone had filed for bankruptcy, declaring assets of $5,400 and

liabilities in excess of $100 million.  (Summary of Schedules, Ex. 33 at 8 to Nilan Aff.

[Doc. No. 58-17].)

### D.  The Financial Institution Bond, Highland Bank's Settlement Award, and This Litigation

        Before entering into the Assignment Agreement, Highland Bank and BancInsure

entered into a Financial Institution Bond, under which BancInsure agreed to indemnify

Highland Bank for certain losses arising from a variety of exposures, such as forgery and

counterfeiting.  (Insuring Bond, Ex. A to Compl. [Doc. No. 1-1].)  In January 2011,

Highland Bank submitted a Proof of Loss to BancInsure, claiming that the insuring bond

covered Highland Bank's losses relating to the First Premier/EAR equipment lease

financing.  (Compl. ¶ 35 [Doc. No. 1].)  Highland Bank submitted a total claim of

$2,011,618.30, the loss it incurred from the three loans.  (Id. ¶ 38.)  In its Proof of Loss

submission, Highland Bank contended that the loss was covered under Insuring Agreement

D ("Forgery or Alteration") and Insuring Agreement E ("Securities").[1]  (Proof of Loss, Ex.

28 at 1 to Nilan Aff. [Doc. No. 58-14].)  In relevant part, Insuring Agreement E provides

coverage for:

> Loss resulting directly from the Insured having, in good faith, for its own
> account or for the account of others,
>
> (1) acquired, sold or delivered, given value, extended credit or assumed
>     liability on the faith of any original
> * * *
> > (f) Corporate, partnership or personal Guarantee, [which]
> > * * *
> > > (i)     bears a signature of any maker, drawer, issuer, endorser,
> > >         assignor, lessee, transfer agent, registrar, acceptor,
> > >         surety, guarantor, or of any person signing in any other
> > >         capacity which is a Forgery,
> > > * * *
> (2) guaranteed in writing or witnessed any signature upon any transfer,
>     assignment, bill of sale, power of attorney, Guarantee, endorsement or any
>     items listed in (1)(a) through (h) above.  This includes loss resulting
>     directly from a registered transfer agent accepting or instructions
>     concerning transfer of securities by means of a medallion seal, stamp, or
>     other equipment apparatus which identifies the Insured as guarantor, as
>     used in connection with a Signature Guarantee Program, but such use or
>     alleged use of said medallion seal, stamp, or other equipment apparatus
>     was committed without the knowledge or consent of the Insured, and the
>     Insured is legally liable for such loss,
>
> (3) acquired, sold, or delivered, given value, extended credit or assumed

---

[1] On May 28, 2013, Highland Bank withdrew its argument that it was entitled to coverage under Insuring Agreement D.  (Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 7 [Doc. No. 71].)

liability on the faith of any item listed in (1)(a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (1)(a) through (i) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

(BancInsure Financial Institution Bond at 3, Ex. 1 to Nilan Aff. [Doc. No. 58-1].)

On August 31, 2011, BancInsure denied coverage, contending that because Highland Bank did not have actual physical possession of the document, it failed to satisfy the insuring bond's condition precedent under Insuring Agreement E.  (Denial of Coverage, Ex. 28 at 12-13 to O'Neill Aff. [Doc. No. 25-1] (citing BancInsure v. Marshall Bank, 400 F. Supp. 2d 1140, 1143 (D. Minn. 2005).)  That same day, BancInsure filed the instant lawsuit, seeking a declaratory judgment that BancInsure had no obligation to Highland Bank stemming from the First Premier/EAR agreements.  (Compl. ¶ 46 [Doc. No. 1].)

On November 5, 2012, Highland Bank acknowledged and consented to an Assignment and Settlement Agreement between Republic Bank of Chicago and First Premier in relation to the Chapter 11 Bankruptcy Petition filed by EAR.  (Ex. B at 1 to O'Neill Aff. [Doc. No. 52-1].)  Under a court order in the EAR Bankruptcy Litigation, First Premier submitted a Proof of Claim on behalf of itself and other involved banks, including Highland Bank, in connection with Lease Schedules 005R, 008, and 009R.  (Id. at 2.)  In consideration for the transfer to Republic Bank of Chicago of all right, title, and interest in First Premier's Proof of Claim, First Premier received $600,000.  (Id. at 5.)  Under a Side

8

Agreement, the involved banks agreed to receive a pro rata share of the remaining

settlement amounts following payment to First Premier's attorneys.  (Ex. C at 3 to O'Neill

Aff. [Doc. No. 52-1].)  $48,715.20 was Highland Bank's pro rata share, in release of any

rights to the equipment it may have had.  (Id.)  Highland Bank has deducted its pro rata

share from its Proof of Loss submission of $2,011,618, now claiming a new loss total of

$1,962,903.10.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 9 [Doc. No. 51].)

On April 2, 2012, Highland Bank moved for partial summary judgment on the

limited issue of whether First Premier was the "authorized representative" of Highland Bank

regarding the "actual physical possession" requirement of Insuring Agreement E.  (Mot. for

Partial Summ. J. [Doc. No. 27].)  On December 4, 2012, this Court granted Highland

Bank's motion, finding the existence of an agency relationship because: (1) Highland Bank

consented to First Premier acting as its agent for purposes of the transactions at issue—

specifically, for purposes of First Premier maintaining possession of the original Malone

guaranty; (2) First Premier acted on Highland Bank's behalf by retaining the original

documents, collecting and remitting loan payments, paying sales and use tax, providing

additional financial documentation, updating insurance, inspecting collateral and acting as

the primary contact with EAR; and (3) Highland Bank possessed "control" over the location

of the original documents and over the transaction generally, as Highland Bank held the

funds.  (Order at 9-11 [Doc. No. 43].)  The Court explicitly did not decide the ultimate issue

of whether the insuring bond covers Highland Bank's claim.  (Id. at 15.)

On March 14, 2013, Highland Bank moved for summary judgment, seeking

coverage for its loss under Insuring Agreement E of the Financial Institution Bond.  (Def.'s

Mot. for Summ. J. [Doc. No. 49].)  On May 7, 2013, BancInsure moved for summary

judgment, seeking a declaratory judgment in its favor, dismissing Highland Bank's

counterclaims, and seeking an award of its costs and disbursements.  (BancInsure, Inc.'s

Mot. for Summ. J. [Doc. No. 65].)  These motions are now before the Court.

## III.   DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

The moving party bears the burden of showing that there is no genuine issue of material fact

and that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986); Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).  A dispute over a

fact is "material" only if its resolution might affect the outcome of the lawsuit under the

substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute

over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict

for the non-moving party."  Id.  All justifiable inferences are to be drawn in the non-

movant's favor and the evidence of the non-movant is to be believed.  Id. at 255.

As to the parties' competing requests for issuance of a declaratory judgment, under

Rule 57 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, a court

"may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  A court

may entertain a declaratory judgment action if "the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

### B.  Insurance Contract Interpretation

State law governs the interpretation of insurance policies. Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003). Under Minnesota law, the interpretation and construction of an insurance policy is a matter of law for the court. Scottsdale Ins. Co. v. RiverBank, 815 F. Supp. 2d 1074, 1080 (D. Minn. 2011). The Court construes an insurance policy to give effect to the parties' intent as expressed in the language of the policy. Id. In addition, an insurance policy must be construed as a whole, with all terms given effect if possible. Id. If the language of an insurance policy is clear, the Court gives it its "usual and accepted meaning." Id. If the policy language is ambiguous, however, it is construed against the insurer and in favor of coverage. Id.

This last principle, however, generally does not apply when the policy in question is a standard bond, drafted by representatives from the banking and insurance industries. See First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co., 485 F.3d 971, 977 (7th Cir. 2007). The Financial Institution Bond here is a standard form contract created with input from the Surety Association of America and the American Bankers Association. See Ohio Savings Bank v. Progressive Cas. Ins. Co., 521 F.3d 960, 962 (8th Cir. 2008). In addition, courts have found Insuring Agreement E of the Financial Institution Bond to be unambiguous. See First McHenry Corp. v. BancInsure, Inc., No. 10 C 50256, 2011 U.S. Dist. LEXIS 64589, at *7 (N.D. Ill. June 17, 2011) (citing cases in support from the Tenth and Seventh Circuits).

Therefore, the general rule of construing ambiguous terms against the insurer does not apply in this case.

### C. Coverage under Insuring Agreement E of the Financial Institution Bond

#### 1. "Loss resulting directly from"

BancInsure argues that there is no loss "resulting directly from" Highland Bank's extension of credit on the faith of a forged document, because irrespective of the forgery on the guaranty, Highland Bank would have suffered a loss. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 13 [Doc. No. 57].) Highland Bank contends that this element is met because the forged Malone guaranty caused Highland Bank to enter into this transaction and extend credit where it otherwise would not have. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 9-15 [Doc. No. 51].)

The Minnesota Court of Appeals recently addressed the issue of what constitutes loss "resulting directly from" a bank's reliance on forged documents. See Alerus Fin. Nat'l Ass'n v. St. Paul Mercury Ins. Co., No. A11-680, 2012 Minn. App. Unpub. LEXIS 100, at *14-17 (Minn. Ct. App. Jan. 30, 2012). In Alerus, several banks made loans secured by guarantees and stock of Trans Continental Airlines, an entity that proved to be a Ponzi scheme. Id. at *2-3. The banks subsequently made claims upon financial institution bonds, arguing that their losses were due to forgeries on the stock certificates and documents related to the guarantees. The court, however, disagreed and found that it was the "worthlessness of the TCA guarantees and stock" that directly caused the banks' losses, not the forgeries. Id. at *15-17. In so finding, Alerus followed a majority of courts holding that loan loss is not directly caused by reliance on forgeries constituting or referencing collateral

when the collateral is worthless at the time of the loan.  Id. at *14-15.

Highland Bank claims that when it extended credit, the Malone guaranty and the underlying collateral had value.  (Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 10 [Doc. No. 71].)  Specifically, Highland Bank points to UCC Financing Statements, invoices, and a certificate of acceptance that a security interest had been recorded in the collateral delivered under the First Premier/EAR lease agreement.  (Exs. 5 & 6 to O'Neill Aff. [Doc. Nos. 62-2, 62-3].)  But credit presentations prepared by Highland Bank itself show that the Malone guaranty was worthless.  Before entering the first lease transaction, Highland Bank was aware that Sheldon Player and Donna Malone had a tangible net worth of negative $4,580,000 and contingent liabilities of $38,811,683.  (Ex. 15 at 5 to Nilan Aff. [Doc. No. 58-5].)  And before entering the second and third lease transactions, the bank was aware that Player and Malone had a tangible net worth of negative $13,134,614 and contingent liabilities of $53,500,000.  (Ex. 16 at 7 to Nilan Aff. [Doc. No. 58-9].)  In addition, Highland Bank's Chief Credit Officer and Senior Vice President stated under oath that the lease collateral does not exist.  (Aff. of Deborah Lange ¶ 7, Ex. 27 to Nilan Aff. [Doc. No. 58-13].)  Finally, Patrick J. O'Malley, who reviewed EAR's books and records for EAR's bankruptcy proceeding, stated under oath that "EAR was not even close to solvent from 2005 until its bankruptcy filing in 2009."  (O'Malley Aff. ¶ 16, Ex. 1 to O'Neill Aff. [Doc. No. 75-1].)  These facts show that the Malone guaranty and the collateral were worthless when Highland Bank extended credit.

The facts here align with those of Alerus.  Persuaded by the holding in Alerus, the Court finds that Highland Bank's loss resulted directly not from the forged guaranty, but

rather, from the worthlessness of the collateral and the Malone guaranty.  In other words, even if the Malone guaranty were authentic, the loss nevertheless would have occurred because the assets purportedly represented did not exist.

In arguing that it need not show the forgery itself caused the loss, Highland Bank primarily relies on three cases: Pine Bluff Nat'l Bank v. St. Paul Mercury Ins. Co., 346 F. Supp. 2d 1020 (E.D. Ark. 2004), First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co., 485 F.3d 971 (7th Cir. 2007), and Beach Cmty. Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190 (11th Cir. 2011).  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 9-15 [Doc. No. 51].) Of these cases, only Pine Bluff supports Highland Bank's position.  346 F. Supp. 2d at 1030.  Pine Bluff, however, was examined and rejected by the trial court in Alerus. Specifically, the trial court in Alerus declined to adopt the holding in Pine Bluff because Pine Bluff analyzed the language of Insuring Agreement E without considering the apparent purpose of a financial institution bond, or the well-recognized principle that the bond does not provide credit insurance.  Like the Minnesota Court of Appeals, this Court agrees with the trial court's analysis in Alerus and declines to follow Pine Bluff.

As for Beach Community and Manitowoc, neither case rejects the principle that where assets are nonexistent, it is the absence of collateral that directly causes the bank's loss.  Moreover, the bond language in Manitowoc is distinguishable from the bond language in this case.  In Manitowoc, the bond required "loss by reason of" the bank having "extended any credit . . . or otherwise acted upon any security, document, or other written instrument which proves to have been a forgery . . . ."  485 F.3d at 975.  By contrast, the "loss resulting directly from" language in the parties' Insuring Agreement E implies a closer

causal nexus between the forgery and the loss than the bond at issue in <u>Manitowoc</u>.  Further,

<u>Beach Community</u> distinguished the following situations: (1) where even if the documents

securing a loan had borne legitimate signatures, they still would have been worthless, and

(2) had the documents borne legitimate signatures, they would have had value.  635 F.3d at

1196.  In <u>Beach Community</u>, an authentic guaranty would have had value.  <u>Id.</u>  By contrast,

Malone's guaranty was worthless from the start of Highland Bank's loans.  Considering

Minnesota law and the majority rule, the Court finds that Highland Bank's losses resulted

directly from the worthlessness of their collateral—not from any forgery.

For these reasons, Highland Bank has not established the loss "resulting directly

from" element for coverage under Insuring Agreement E.

### 2. "Extended credit . . . on the faith of any original . . . personal Guarantee"

Highland Bank argues that it relied on the faith of the Malone guaranty in extending

credit.  Highland Bank supports this argument with the testimony of its former Chief Credit

Analyst, Joseph White; its lead Credit Analyst, Chidi Egbue; and First Premier's Stephen

Alpeter, that the bank would not have proceeded with the transaction without Malone's

guaranty.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 18-21 [Doc. No. 51].)  Highland

Bank also argues that this Court already ruled on the reliance element in its previous order

granting partial summary judgment.[2]  (<u>Id.</u> at 21-22.)  Further, Highland Bank notes that the

Malone guaranty was referenced in a transaction summary provided by First Premier,

---

[2] The Court respectfully disagrees, as its previous order was "strictly limited to the issue of whether First Premier was Highland Bank's authorized representative."  (Dec. 4, 2012, Order at 15-16 [Doc. No. 43].)

marked on a checklist as required, and included in the package provided by First Premier before funding the loan.  (Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 18 [Doc. No. 59].)  Finally, Highland Bank argues that the guaranty runs with the Lease Agreement between First Premier and EAR to all the banks with assigned lease schedules.  (Hr'g Tr. at 37.)

In opposition, BancInsure argues that Highland Bank cannot show reliance on the Malone guaranty because it never obtained a legal interest in the guaranty, and it never examined the original document before funding the loans.  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 25 [Doc. No. 57].)

Insuring Agreement E restricts its coverage to losses resulting from Highland Bank's extension of credit "on the faith of" an original personal guaranty that was either forged, altered, lost, or stolen.  This language means that the bank must have relied on the original document when it decided to extend credit.  See Republic Nat'l Bank of Miami v. Fidelity and Deposit Co. of Maryland, 894 F.2d 1255, 1263 (11th Cir. 1990) (to demonstrate coverage under Agreement E, the insured "must establish that it relied on" the forged document); Ohio Sav. Bank, 521 F.3d at 964 ("The plain language of Insuring Agreement (E) focuses on the point in time when [the bank] made a decision to extend credit.").

The record shows that Highland Bank cannot establish reliance because it never obtained a legal interest in the Malone guaranty.  First, the guaranty was executed between First Premier and Donna Malone, promising repayment only to First Premier for all obligations under the Lease Agreement.  (Malone Guaranty, Ex. 10 to Nilan Aff. [Doc. No. 58-5].)  Second, the Lease Agreement was executed between EAR and First Premier,

without any reference to Highland Bank.  (Lease Agreement, Ex. 2 to Nilan Aff. [Doc. No. 58-2].)  Although the bank contends that "each prong of your [Highland Bank's] lease has an interest in that guaranty," (Hr'g Tr. at 37), to find that the Malone guaranty runs with the Lease Agreement to Highland Bank based on this argument is too attenuated a step for the Court to take.

Third, only the "Collateral Assignment of Lease Payments and Equipment" transfers First Premier's interest in each of the lease schedules.  (Ex. 12-14 to Nilan Aff. [Doc. No. 58-7].)  Under this agreement, First Premier assigned the following to Highland Bank: the "rental payments due or to become due under the Lease," and all of First Premier's "rights, title and interest in and to the personal property subject to the Lease."  (E.g., Ex. 12 ¶¶ 1-2 to Nilan Aff. [Doc. No. 58-7].)  These assignments fall under explicit paragraph headings entitled "Collateral Assignment of Lease Payments" and "Assignment of Equipment."  (Id.)  No paragraph heading in this document addresses the assignment of any guaranty.  Highland Bank argues that paragraph six of the agreement assigns the Malone guaranty, citing the following language:

> Assignee is also authorized to bill or invoice Lessee for all amounts due and to become due under the Lease, as outlined on the attached amortization schedule, and to compromise, adjust, and grant extension of time for payment by Lessee or any other persons obligated on the Lease or guaranty, without notice to Assignor and without affecting Assignor's obligation hereunder.

(Id. ¶ 6.)  The mere reference to the word "guaranty" in this paragraph, however, does not effectuate an assignment of the Malone guaranty.  Rather, this paragraph grants Highland Bank the right to seek payment from EAR.  Regarding guarantors, this paragraph allows Highland Bank to "compromise, adjust, and grant extension of time for payment," but it

does not grant the bank an affirmative right to collect or sue on the guaranty.  Considering the language in this paragraph and the Collateral Assignment as a whole, the Court declines to read an assignment of the Malone guaranty into the parties' agreement.  Because the guarantees were not assigned to Highland Bank, the bank could not rely on them in extending credit.[3]  Accordingly, Highland Bank cannot show that it extended credit on the faith of the original Malone guaranty.

Because Highland Bank has not established two required elements for coverage under Insuring Agreement E—(1) loss "resulting directly from" and (2) "extended credit . . . on the faith of any original . . . personal Guarantee"—the Court finds that Highland Bank is not entitled to coverage and grants summary judgment in BancInsure's favor.

### 3.   Reasonable Expectations Doctrine

Highland Bank argues that it should be awarded coverage under the doctrine of reasonable expectations.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 30 [Doc. No. 51].)  The Court respectfully disagrees.

The reasonable expectations doctrine applies to situations in which "a party's coverage is significantly different from what the party reasonably believes it has paid for," and "where the only notice the party has of that difference is in an obscure and unexpected provision."  Westfield Ins. Co. v. Robinson Outdoors, Inc., 700 F.3d 1172, 1175-76 (8th Cir. 2012).  Minnesota courts have restricted the doctrine to exceptional cases where a

---

[3] Because Highland Bank has no legal interest in the Malone guaranty, the bank's reference to the guaranty in its Lease Financing checklist is immaterial to show reliance.  (See Ex. 9 to O'Neill Aff.)  The same applies to any references to the guaranty in a transaction summary or other materials provided by First Premier.

policy provision is a hidden major exclusion or unconscionable as a result of unequal

bargaining power.  St. Paul Fire and Marine Ins. Co. v. F.D.I.C., 968 F.2d 695, 702-03 (8th

Cir. 1992).

This case is distinct from Atwater Creamery Co. v. W. Nat. Mut. Ins. Co., 366

N.W.2d 271, 277 (Minn. 1985), cited by Highland Bank, which applied the reasonable

expectations doctrine.  In Atwater, the major exclusion that operated to defeat the insured's

expectations was placed in the definitions section of the policy.  366 N.W.2d at 278-79.  So

hidden, the insured in Atwater, a lay person, was not aware of the exclusion and his lack of

coverage for the loss.  Id.  Here, by contrast, the exclusions are not disguised in the fine

print of the policy's definitions; Section 2 ("Exclusions") of the Financial Institution Bond

states them explicitly.  (Ex. 1 at 17 to Nilan Aff. [Doc. No. 58-1].)  Moreover, because the

parties are experienced business individuals, there is no disparate bargaining power.  See

Useldinger & Sons, Inc. v. Hangsleben, 505 N.W.2d 323, 327 (Minn. 1993) (finding

application of the reasonable expectations doctrine inappropriate where the insurance

purchasers were experienced business individuals).  Under these circumstances, applying

the doctrine of reasonable expectations would expand the doctrine beyond its current scope

under Minnesota law, and the Court declines to do so.

### D.  Claim for Breach of Good Faith and Fair Dealing

Finally, at issue is Highland Bank's claim for breach of good faith and fair dealing.

Highland Bank asserts that BancInsure breached its covenant of good faith and fair dealing

by "failing to provide coverage for Highland Bank under the Bond Policy, and seeking to

insert additional terms and conditions of the policy where no such terms and conditions

exist."  (Countercl. ¶ 45 [Doc. No. 3].)

The Court respectfully disagrees.  Under Minnesota law, "every contract includes an implied covenant of good faith and fair dealing," requiring that one party not unjustifiably hinder the other party's performance of the contract.  RBC Dain Rauscher, Inc. v. Fed. Ins. Co., No. 03-2609, 2003 U.S. Dist. LEXIS 26475, at *17 (D. Minn. Dec. 2, 2003) (citation omitted).  But a party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights.  Id. at *18.  Here, BancInsure is asserting and enforcing its rights under Insuring Agreement E, insisting that all elements of coverage under this clause be met before indemnifying Highland Bank for its losses.  (Pl. BancInsure's Mem. in Supp. of Summ. J. at 31 [Doc. No. 69].)  Doing so and withholding coverage in the meantime is not bad faith or unfair dealing.

In light of its conclusion that Insuring Agreement E does not cover Highland Bank's loss, the Court finds that BancInsure had a reasonable basis for denying payment.  The Court also finds that BancInsure did not insert additional terms and conditions where they do not exist in Insuring Agreement E.  Therefore, BancInsure is entitled to summary judgment on Highland Bank's claim for breach of the duty of good faith and fair dealing.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  BancInsure's Motion for Summary Judgment [Doc. No. 65] is **GRANTED**;

2.  Highland Bank's Motion for Summary Judgment [Doc. No. 49] is **DENIED**;

3.  Highland Bank's counterclaims for breach of contract and breach of good faith and

fair dealing are **DISMISSED WITH PREJUDICE**;

4.  The Court **DECLARES** that Insuring Agreement E does not cover Highland Bank's claims in this matter.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:       September 23, 2013       s/ Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Court Judge